Argued and submitted February 16, affirmed June 8, 1994

# FIRST INTERSTATE BANK
# OF OREGON, N.A.,
*Respondent,*

*v.*

# Suzy WILKERSON,
dba Summit Paints & Rottweilers,
*Appellant,*

*and*

# Linda SANDERSON,
*Defendant.*

(91-CV-0048-15; CA A78166)

876 P2d 326

William J. Storie argued the cause for appellant. With him on the briefs were Gordon J. Evans and Holmes, Hurley, Bryant Lovlien & Lynch.

Brian L. Gingerich argued the cause for respondent. With him on the brief were Howard G. Arnett and Karnopp, Petersen, Noteboom, Hubel, Hansen & Arnett.

Before Warren, Presiding Judge, and Edmonds and Leeson, Judges.

WARREN, P. J.

## WARREN, P. J.

Defendant[1] appeals from a summary judgment for plaintiff, ORCP 47, assigning error to the granting of the motion. She first contends that the trial court erred in applying a "subjective" standard to conclude that First Interstate Bank (FIB) had acted in good faith when it paid a check that created an overdraft on defendant's business account. Next, she asserts that the trial court erred in concluding that there were no genuine issues of material fact. We affirm.

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. ORCP 47; *Seeborg v. General Motors Corporation*, 284 Or 695, 699, 588 P2d 1100 (1978). We view the evidence in the light most favorable to the party opposing the motion. *Tolbert v. First National Bank*, 312 Or 485, 494, 823 P2d 965 (1991).

These facts are not in dispute. Defendant and Sanderson opened a joint business checking account (account) at FIB. When they opened the account, defendant and Sanderson signed an agreement that provided, in part:

"Each of you understand that by signing this signature card, you are entering into an agreement with [plaintiff] the terms of which are recited in the applicable sections of the separate Deposit Account Brochure and Schedule of Account Fees and Rates information brochure (the Brochures), receipt of which are hereby acknowledged. You and [plaintiff] each agree to be bound by applicable Federal and State laws, rules, and regulations and by all rules, regulations, and charges as set forth in the Brochures * * *."

The agreement also provided that either defendant or Sanderson had authority to write checks on the account.

About two months after opening the account, Sanderson wrote a check for $95,000 to pay the balance owed on a horse that defendant was purchasing for the business. Sanderson knew there were insufficient funds in the account to pay the check. Later, the check was presented to FIB for payment. An officer at FIB telephoned the business and spoke

---

[1] Defendant Sanderson did not appeal. Our reference to "defendant" in this opinion means only defendant Wilkerson.

to Sanderson about the check. Sanderson asked the officer if he could hold the check until she could arrange a deposit to cover it. The officer said that he could not. Sanderson expected to get sufficient funds to pay the check within a few days. FIB paid the check, creating an overdraft of about $95,000. Later, defendant took possession of the horse and registered it in her name. At that time, she knew of the overdraft. Defendant unsuccessfully attempted to secure a mortgage on property she owned to repay the overdraft. Since then, neither defendant nor Sanderson has made any payments to FIB on the overdraft.

FIB brought this action to recover the amount of the overdraft. The trial court granted its motion for summary judgment.

The parties agree that the transaction between them that created the overdraft is governed by Article 4 of the Uniform Commercial Code (UCC), ORS chapter 74.[2] At the time of the overdraft, ORS 74.4010(1) provided:

> "As against its customer, a bank may charge against the account of the customer any item which is otherwise properly payable from that account even though the charge creates an overdraft."

Defendant first argues that, when FIB exercised its discretion under that provision and paid the check, it had a common law implied duty to act with "objective" good faith, or alternatively, that it had a statutory duty to act in good faith and with ordinary care. FIB contends that, because it had a statutory and contractual right to pay the overdraft, any argument that it lacked good faith in paying the check would not provide a defense to its action to recover the amount of the overdraft. It also argues that, in any event, the trial court applied the correct standard in determining that the bank had acted in good faith. Finally, FIB also argues that ordinary care is not required in all transactions governed by Article 4

---

[2] ORS chapter 74 applies, in part, to the liability of a bank for its action or nonaction in handling "items" for the purposes of presentment, collection or payment. ORS 74.1020. The legislature extensively revised ORS chapter 74 during the 1993 legislative session. Or Laws 1993, ch 545. Because the events that gave rise to this action took place before 1993, the preamendment version of ORS chapter 74 applies.

and, if it is, FIB exercised ordinary care when it paid the check.

■        The first issue is whether the duty of good faith imposed by Article 4 of the UCC displaces the common law duty of good faith. In interpreting a statute, our task is to discern the intent of the legislature. ORS 174.020; *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993). To do that, we first examine the text and context of the statute. 317 Or at 610. Article 1 of the UCC, ORS chapter 71, contains general provisions that apply to Article 4. ORS 74.1040(4).[3] ORS 71.2030 provides that "[e]very contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance or enforcement." ORS 71.2010 provides, in part:

> "Subject to additional definitions contained in other sections of the Uniform Commercial Code which are applicable to a specific series of sections, and unless the context otherwise requires, in the Uniform Commercial Code:
>
> "* * * * *
>
> "(19) 'Good faith' means honesty in fact in the conduct or transaction concerned."

The parties agree that the definition of "good faith" in ORS 71.2010(19) sets forth a subjective standard. The UCC definition of subjective good faith looks "to the intent or state of mind of the party concerned." *Community Bank v. Ell*, 278 Or 417, 428, 564 P2d 685 (1977). Defendant argues that the common law objective standard of good faith[4] may be used to supplement that definition. The UCC does not state expressly whether the standard of good faith that applies to Article 4 displaces the common law's implied duty of good faith.

We find the Supreme Court's analysis in *U.S. National Bank v. Boge*, 311 Or 550, 814 P2d 1082 (1991),

---

[3] At the time of the overdraft, ORS 74.1040(4) provided:

"In addition, ORS 71.1010 to 71.2080 contain general definitions and principles of construction and interpretation applicable throughout ORS 74.1010 to 74.5040."

[4] The common law duty of good faith requires that the parties act in an objectively reasonable manner in the performance and enforcement of their contracts. *See Best v. U.S. National Bank*, 303 Or 557, 739 P2d 554 (1987); *Restatement (Second) Contracts* § 205, *comment d* (1979).

instructive in addressing defendant's argument. In that case, the parties agreed that the good faith specified by ORS 71.2010(19) applied to their secured transaction. However, they disagreed whether that was the exclusive standard that applied to transactions governed by Article 9 of the UCC, ORS chapter 79. The Supreme Court first noted that the UCC does not expressly state that the statutory duty of good faith found in ORS 71.2010(19) displaces the common law implied duty of good faith in secured transactions. The court then analyzed the text and context of pertinent provisions of the UCC to discern the legislature's intent, and held that the statutory duty of good faith in ORS 71.2010(19) displaces the common law duty of good faith in Article 9.[5] 311 Or at 564.

Because the same provisions of ORS chapter 71 resolve whether the statutory duty of good faith displaces the common law duty of good faith in Article 4, the Supreme Court's analysis in *Boge* is applicable here. First, at the time of the overdraft, ORS 71.2010(19) contained the only definition of "good faith" applicable to Article 4. Next, the text and context of ORS 71.2030 "suggests that the statutory definition of good faith is meant to be both uniform and complete." 311 Or at 558.

Defendant argues, relying on ORS 71.1030,[6] that "the specific content of a good faith standard is not limited to the [UCC's] four corners." ORS 71.1030, however, is a "problem solving" or "gap filler" provision, and was intended to apply if a logical gap in the UCC needed to be filled by some other source of law. 311 Or at 559. There is no such gap here. Moreover, certain provisions in the UCC contain different definitions of good faith. For example, ORS 72.1030(1)(b) provides that, in a transaction involving the sale of goods, " '[g]ood faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Other sections of the UCC

---

[5] The court noted, however, that its holding did not apply to ORS 79.3180(2), which modifies the statutory duty for transactions encompassed in that section, by mandating action "in good faith and in accordance with reasonable commercial standards."

[6] ORS 71.1030 provides, in part:

"Unless displaced by the particular provisions of the Uniform Commercial Code, the principles of law and equity * * * shall supplement its provisions."

expressly require the observance of reasonable commercial standards in addition to honesty in fact. *See, e.g.,* ORS 75.1090(1); ORS 77.4040; ORS 78.3180. "Those differences in statutory wording demonstrate a conscious legislative choice to select a particular definition of good faith—and no other—in each Article or section of the UCC." 311 Or at 560.

Finally, we consider the text of ORS 71.1020, which provides, in part:

"(1)   The Uniform Commercial Code shall be liberally construed and applied to promote its underlying purposes and policies.

"(2)   Underlying purposes and policies of the Uniform Commercial Code are:

"(a)   To simplify, clarify and modernize the law governing commercial transactions.

"* * * * *

"(c)   To make uniform the law among the various jurisdictions."

Those purposes are served if the statutory duty of good faith displaces the common law duty, because the statutory definition standing alone is simpler and clearer than it would be if it were supplemented by the common law. *See U.S. National Bank v. Boge, supra,* 311 Or at 561. We conclude that the statutory duty of good faith applicable to Article 4 displaces the common law implied duty of good faith.

■       Defendant next argues that, even if FIB had a duty to act only with subjective good faith, whether it did so when it created the overdraft is a question of fact for the jury. Whether a bank acts in good faith is generally a question for the jury, *unless* only one inference from the evidence is possible. *Community Bank v. Ell, supra,* 278 Or at 428. Here, FIB met its duty of good faith if it acted with honesty in fact. All that honesty in fact requires is a pure heart and an empty head. *U.S. National Bank v. Boge, supra,* 311 Or at 565. Moreover, mere negligence or failure to make inquiries that a reasonably prudent person would make does not amount to bad faith. *Community Bank v. Ell, supra,* 278 Or at 428.

Here, the uncontroverted evidence is that an officer at FIB called defendant's place of business to inquire about

the check. Sanderson asked the officer whether FIB could hold the check. The officer said that it could not.[7] Sanderson expected funds to cover the check within a few days. She does not recall whether she told the officer that she would pay the check as soon as those funds arrived. The officer testified that he based his decision to pay the check, in part, on Sanderson's representation that she would get funds to pay the check.[8] There is no evidence that, when the officer decided to pay the check, he acted inappropriately or with an improper motive. We conclude that the only inference from the record is that FIB acted in good faith.

■     Defendant next argues that Article 4 also imposed a duty of ordinary care on FIB's handling of the overdraft. Defendant's argument relies on ORS 74.1030(1), which, at the time of the overdraft, provided, in part:

> "The effect of the provisions of ORS 74.1010 to 74.5040 may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care * * *."

FIB argues that ORS 74.1030(1) applies only to those provisions of Article 4 that impose a separate duty to act with ordinary care.

Even assuming that ORS 74.1030(1) imposes a duty of ordinary care on every transaction within Article 4,[9] we conclude that FIB met that standard of care as a matter of law. At the time FIB paid the check that created the overdraft, ORS 74.1030(3) provided, in part:

> "Action or nonaction approved by ORS 74.1010 to 74.5040 or pursuant to federal reserve regulations or operating letters constitutes the exercise of ordinary care * * *."

ORS 74.4010 authorized FIB to charge against the account "any item which is otherwise properly payable from that

---

[7] Defendant contends that FIB agreed to hold the check. There is no evidence that defendant spoke directly with FIB or that Sanderson told defendant that FIB had agreed to hold the check.

[8] There is evidence that the bank had previously paid checks made by defendants that had created overdrafts on their account.

[9] See comment 4 to ORS 74.1030.

account even though the charge creates an overdraft." Therefore, FIB exercised ordinary care as a matter of law if the check was "otherwise properly payable."

■ ■ An item is properly payable if it is signed with a genuine or authorized signature of the drawer and all indorsements are genuine or authorized. *See Barber v. U.S. National Bank*, 90 Or App 68, 750 P2d 1183 (1988); *Medford Irrigation Dist. v. Western Bank*, 66 Or App 589, 676 P2d 329 (1984). The fact that payment of an item creates an overdraft in the account does not establish that the item was not properly payable. 7 Anderson, *Uniform Commercial Code* §§ 4-401:12-13 (3d ed 1985); *see also* 2 Bailey, *Oregon Uniform Commercial Code* § 4.31 (2d ed 1990). Defendant does not argue that the check was improperly signed or indorsed. We conclude that the check was properly payable. Therefore, FIB's action constituted the exercise of ordinary care as a matter of law.

■ ■ Next, defendant argues that, if the check was properly payable, she cannot be held liable merely by being a cosignatory on the account. Although there may be circumstances where a cosignatory is not liable for another signatory's overdraft, we agree with the commentators who suggest that a cosignatory should be liable if he or she participated in the overdraft, benefitted from it or ratified the transaction creating the overdraft. 1 White and Summers, *Uniform Commercial Code* 883, § 18-3 (3d ed 1988); *see also Williams v. Cullen Center Bank & Trust*, 685 SW2d 311 (Tex 1985).

In this case, the undisputed evidence is that defendant and Sanderson were co-signatories on a joint business checking account. Either of them could and did sign checks. Although defendant did not sign the check that created the overdraft, she took possession of a horse purchased by that check *after* she knew of the overdraft. Defendant still had possession of the horse at the time of the summary judgment proceeding. We conclude that, as a matter of law, defendant ratified and benefitted from the overdraft when she took and retained possession of the horse.[10] *See Maasdam v. Van Blokland et al*, 123 Or 128, 261 P 66 (1927).

---

[10] In her brief, defendant contends that the value of the horse is "negligible." An affidavit by counsel for defendant attempts to support that assertion by citing to

██ Finally, defendant argues that there are other genuine issues of material fact. First, she argues that FIB should have contacted her before creating the overdraft. Defendant does not provide any authority for the proposition that FIB had a duty to contact both signatories on the account before exercising its discretion to pay the check. Next, in her reply brief, defendant disputes an allegation by FIB that she received account brochures containing the terms of the checking account. When defendant and Sanderson opened the account, both of them signed an account agreement. By signing that agreement, defendant assented to be bound by applicable state laws, including ORS 74.4040(1).[11] ORS 74.4040(1) authorized FIB to pay or dishonor the check in its discretion. Whether defendant received those brochures is not relevant to our decision.

Based on the record before us, we conclude that there are no genuine issues of material fact, and that FIB is entitled to judgment as a matter of law.

Affirmed.

---

defendant's deposition. The cited portion of defendant's deposition refers to the negligible value of *other* horses sold by defendant.

[11] Defendant contends that her intent in signing that agreement was to "show her valid signature and nothing else." A person is presumed to be familiar with the contents of any document that bears the person's signature. *Broad v. Kelly's Olympian Co.*, 156 Or 216, 229, 66 P2d 485 (1937).